# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | | |
|---|---|---|
| DURHAM SCHOOL SERVICES, L.P. ) | | |
| ) | No. 2:14-cv-1241-DCN | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| GENERAL DRIVERS, ) | | |
| WAREHOUSEMEN and HELPERS, ) | | |
| LOCAL UNION NO. 509, a/w ) | | |
| INTERNATIONAL BROTHERHOOD ) | **ORDER** | |
| OF TEAMSTERS, ) | | |
| of the National Labor Relations Board, ) | | |
| ) | | |
| Defendant. ) | | |
| _____) | | |
| DURHAM SCHOOL SERVICES, L.P., ) | | |
| ) | | |
| Third-Party Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| PIEDMONT GRIEVANCE COMMITTEE, ) | | |
| ) | | |
| Third-Party Defendant. ) | | |
| _____) | | |

This matter is before the court on plaintiff Durham School Services, L.P.'s ("Durham") motion for summary judgment, defendant General Drivers, Warehouse and Helpers, Local Union No. 509's ("the Union"), motion for summary judgment, and third-party defendant Piedmont Grievance Committee's ("PGC") motion for summary judgment. For the reasons set forth below, the court denies plaintiff's motion for summary judgment and grants defendant's motion for summary judgment. The court further grants third-party defendant's motion for summary judgment.

1

## I. BACKGROUND

Durham is a limited partnership organized under the laws of Delaware engaged in providing bus transportation to students in Charleston County. Durham's Mot. 2. Durham operates a fleet of over 350 school buses and employs over 400 school bus drivers. Id. The Union is an unincorporated labor union with its principal place of business in West Columbia, South Carolina. Id. at 3. Durham and the Union entered into a collective bargaining agreement in 2007, and again in 2013 ("the 2013 CBA"). Id. This case arises from Durham's termination of a Union employee. Id. at 9. This termination led to a disputed decision issued by the PGC, a bi-partite committee established to hear unresolved grievances between Durham and the Union. Id.

On April 4, 2014, Durham filed the present action against the Union pursuant to Section 301 of the Labor Management Relations Act of 1959 ("LMRA"), 29 U.S.C. § 185, alleging that the "PGC panel acted in bad faith, arbitrarily, and capriciously" in rendering its decision, and thereby denied Durham "a fundamentally fair hearing." Compl. ¶ 22. Durham asks that the court issue an "order vacating and nullifying the PGC decision" and that "the costs of this proceeding be taxed to [the Union]." Id. at 8. On April 14, 2014, the Union filed a counterclaim seeking enforcement of the PGC decision and an order requiring Durham to pay backpay to the discharged employee. On May 12, 2014, Durham filed a third-party complaint against the PGC,[1] alleging that the PGC breached the by-laws in issuing its decision.

On March 27, 2015, the Union, Durham, and the PGC each filed a motion for summary judgment. The PGC filed a response to Durham's motion for summary

---

[1] Individual members of the PGC panel were originally also third-party defendants, but have since been voluntarily dismissed.

judgment on April 10, 2015, to which Durham replied on April 23, 2015.  The Union filed a response to Durham's motion for summary judgment on April 13, 2015, to which Durham replied on April 23, 2015.  Durham filed a response to the Union's motion for summary judgment on April 13, 2015, to which the Union replied on April 17, 2015.  Durham responded to the PGC's motion for summary judgment on April 13, 2015, to which the PGC replied on April 20, 2015.  The motions have been fully briefed and are now ripe for the court's review.

## II.   STANDARDS

### A.     Summary Judgment

Plaintiff, defendant, and third-party defendant have each moved for summary judgment.  Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Anderson, 477 U.S. at 255.

### B.     Enforcement of Arbitration Award

The parties ask the court to decide whether the PGC decision should be vacated as a matter of law.  "The [PGC] decision in this case is entitled to the same deference as any labor arbitration award."  Teamsters Local No. 592 v. Tarmac Am., Inc., No. 3:02-cv-727, at *7 (E.D. Va. March 31, 2003) (citing General Drivers Local No. 89 v. Riss, 372 U.S. 517, 519 (1963); Sappington v. Associated Transp., Inc., 365 F. Supp. 164, 167 (D. Md. 1973)) (discussing plaintiff's allegations regarding a decision issued by the PGC); Union's Mot. Ex. 25 at 7.  "This is consistent with the overriding principal that the parties' chosen dispute resolution method should be given its full authority." Id. at *7.

The Fourth Circuit has recognized that "judicial review of an arbitration award is 'among the narrowest known to the law.'"  Richmond, Fredericksburg & Potomac R. Co. v. Transp. Commc'ns Int'l Union, 973 F.2d 276, 278 (4th Cir. 1992) (quoting Union Pac.

R.R. Co. v. Sheehan, 439 U.S. 89, 91 (1978)).  Indeed, "[e]very presumption is in favor of the validity of the award."  Id. (quoting Burchell v. Marsh, 58 U.S. 344, 351 (1855)).

"Vacatur is appropriate . . . when the exclusion of relevant evidence 'so affects the rights of a party that it may be said that he was deprived of a fair hearing.'"  Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co., 232 F.3d 383, 389 (4th Cir. 2000) (quoting Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901, 763 F.2d 34, 40 (1st Cir. 1985)).  Vacatur is also appropriate if the arbitration award "violates clearly established public policy, fails to draw its essence from the collective bargaining agreement, or reflects merely the arbitrator's personal notions of right and wrong."  Champion Int'l Corp. v. United Paperworks Int'l Union, AFL-CIO, 168 F.3d 725, 729 (4th Cir. 1999) (citing Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996)).

### III.  DISCUSSION

#### A.    Origin of Dispute

Before addressing the parties' arguments in this matter, the court first discusses the origin of the dispute between Durham and the Union and the PGC's handling of the dispute.  On September 24, 2013, Durham terminated the employment of Marquette Cooper Alston ("Alston") for "violating Article 20 of the Durham School Services Local 509 Union Contract in regards to cell phone usage while operating a school bus."  Durham's Mot. Ex. 5.  Article 20 of the 2013 CBA provides that "[n]o employee shall be disciplined, suspended or discharged without just cause."  Id. Ex. 3 at 16.  The agreement requires Durham to use progressive discipline, except that "no written warning is required for discharge for" certain specified offenses, which include "text messaging or

5

use of personal items such as cell phones while operating a passenger transport vehicle." Id. Ex. 3 at 16–17.  Alston's use of a handheld cell phone while operating a school bus was caught on videotape and is not disputed by Alston or by the Union.  Id.

Durham provided both the Union and Alston with a copy of Alston's termination letter the same day that she was terminated.  Id. at 9.  The Union then filed a written grievance alleging that Alston had been terminated without just cause.  Id.  Later that same day, Durham denied the grievance in writing and held a local grievance hearing on October 8, 2013.  Id.  At this hearing, the Union submitted three statements to demonstrate why Alston should not be terminated, including one from the mother of a special needs student whose cell phone conversation with Alston led to Alston's discharge.  Union's Mot. Ex. 11 at 4–6.  The mother explained that Alston had been driving her special needs child to school for the past six years and that she called Alston that day to "find out if the bus was working." Id. Ex. 11 at 4.  On October 21, 2013, Durham denied the grievance.  Durham's Mot. 9.

The 2013 CBA grants the PGC "the authority to hear unresolved grievances submitted and heard in accordance with the Rules of Procedure ["the by-laws"] of the [PGC]."  Id. Ex. 3 at 9.  Accordingly, the Union submitted the Alston grievance to the PGC on October 31, 2013, asserting that the termination was "unjust."  Id. Ex. 9.  In advance of the hearing, Union president L.D. Fletcher ("Fletcher") prepared a brief outlining the Union's case to be presented at the PGC hearing and attached Alston's termination letter as an exhibit.  Durham's Mot. Ex. 12 at 1.  The brief argued that Alston should be reinstated and made whole for all lost wages and benefits.  Id. Ex. 12 at 2.

The PGC panel heard the Alston grievance on January 15, 2014 in a transcribed hearing. Id. at 10; Exs. 10, 14. The panel consisted of two "Employer" representatives, Co-Chairman Tom Houvouras ("Houvoras") and Steve Chambers, and two "Union" representatives, Jim Shurling and Roosevelt Via ("Via"). Id. at 10; Ex. 14. Consistent with the PGC by-laws, Durham presented its case first. Id. at 10. Durham's representative, Dawn Blume ("Blume"), submitted a written brief, outlined the case for the panel, presented witnesses, and showed the videotape of Alston using her cell phone while driving a school bus. Id.

Following the presentation by Durham, Houvouras asked the Union's representative to present the Union's case. Id. In response, Fletcher raised a "point of order" stating that Blume had failed to present Alston's termination letter to the PCG panel during her presentation; therefore, Fletcher argued that Durham's discharge case must fail. Id. at 11. The discussion of Fletcher's point of order went as follows:

> Fletcher: The Point of Order is this is the brief the Company presented. There is no discharge letter. This Company is . . . This panel . . . Astute panel has made these rulings that if there is no grievance presented[2] there is no discharge. That's the Point of Order.
>
> Blume: We have a discharge letter and it was provided to Mr. Fletcher by Friday the day before the hearing. In fact all the grievance paperwork was. And the reason we didn't put it into evidence is because quite frankly it is not disputed. Nobody denies that Ms. Cooper was discharged. That a Union Steward was present. That she signed . . . I don't . . . I believe she did not sign the termination paperwork but her Steward did and the grievance is properly before the panel. But if you would like me to produce a termination letter, that can be done.
>
> Chairman: Union's response.
>
> Fletcher: I've got a Point of Order.

---

[2] Either Fletcher misspoke or this is a typographical error. According to the parties, everyone understood that Fletcher was referring to Blume's failure to present the termination letter. Pl.'s Mot. 10; Fletcher Dep. 36:20–37:14.

> Chairman: Questions of the Union.
>
> Questions of the Company.
>
> Shurling: This is Shurling on the panel. Ms. Blume do you have a copy of the rules and procedures to the Piedmont Grievance Committee?
>
> Blume: Yes.
>
> Shurling: And you are aware that you're able to present any and all evidence in support of your case to the Committee?
>
> Blume: Yes
>
> Shurling: And this is the only evidence you presented?
>
> Blume: Well I presented testimony from all the witnesses. That's evidence. And only . . . the rules of the Piedmont Committee only states that I have to produce a brief of points if I want the Committee to later consider it. It doesn't say that I have to present all the evidence . . . you know, that is undisputed I want the Company . . . the grievance panel to consider. But I do have . . . I did present to Mr. Fletcher on Friday that all the termination paperwork for Ms. Cooper and I'm happy to get that right now . . . and present it to the Committee.
>
> Shurling: That answered my question.
>
> Chairman: Any other questions? Executive Session

Id. Ex. 10 at 31–34. When the PGC panel returned from its Executive Session, Houvoras announced that the Union's point of order was upheld and called the next case for hearing. Id. Ex. 10 at 35.

Alice King ("King"), a representative of Coca-Cola, attended this hearing and spoke with Blume after the PCG panel announced its decision. Id. at 12. King told Blume that the same point of order had been raised in a prior case involving Coca-Cola and that it resulted in the company having to reinstate an employee. Id. King also spoke with Houvoras about the PGC panel's decision. Id. at 12–13. According to King,

8

Houvoras told her that "there had to be a letter in the brief, a termination letter in the brief." King Dep. 19:24–20:4. When King asked how she should have been aware of such a requirement, Houvoras responded that the panel "had always ruled that way, and that it was a participatory panel and if [King] had come more often [she] may have known that." Id. at 20:7-10.

By written notice dated January 19, 2014, the PCG issued a "Billing/Case Decision Summary." Durham's Mot. 13. The decision stated "Point of Order by the Union is upheld" and directed Durham to pay a $50 administrative fee. Id. The decision provided no further explanation. Id. Following the issuance of this decision, Durham did not reinstate Alston. Id.

Fletcher discussed the PGC decision with officials from the Charleston County School District ("School District") and then asked Union Co-Chairman Wayne Gibbs ("Gibbs") to issue a decision explaining the meaning of upholding the Union's point of order. Union's Mot. 11–12. Fletcher also separately told Houvouras that the Union needed an explanation of the PGC decision. Id. at 12.

On March 20, 2014, Houvouras wrote to Blume and Fletcher that, based on PGC decision to uphold the Union's point of order, "the Union's grievance will prevail." Id. Ex. 18. That same day, Gibbs sent a letter to Fletcher explaining that "[t]his Decision thus means that the grievant should be returned to her position she held prior to the termination, as well as all pay during the time of her absence. There should be no lapse of any time, benefit, or pay from the time of termination to her reinstatement." Id. Ex. 17. On March 24, 2014, a Union representative faxed Gibb's letter to the School District which in turn forwarded it to Durham on March 25, 2014. Id. at 14.

### B.    Durham's and the Union's Motions for Summary Judgment

In its motion for summary judgment, Durham argues that the PGC panel decided "whether Durham actually discharged Alston," an issue that "had not been submitted to it and that was reserved exclusively to Durham." Durham's Mot. 15–16. Accordingly, Durham contends that the PGC panel "did not do the job with which it was charged," which was to determine "whether Alston's termination was for just cause." Id. at 15. Durham argues that the court should vacate the PGC decision because it "exceeded [the PGC's] authority under the grievance submission and the CBA." Id. at 19. The Union argues, however, that the court should enforce the PGC decision because it properly followed precedent, "dr[ew] its essence from the [CBA]," and was "not the product of partiality or corruption." Union's Mot. 1.

>   The Fourth Circuit has found that
>
>   [T]he arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

Yuasa, Inc. v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO, Local 175, 224 F.3d 316, 321 (4th Cir. 2000) (quoting United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987)). Accordingly, in asking whether the PGC decision drew its essence from the CBA, the court must also ask "whether the [PGC panel] went beyond the scope of the grievance in deciding" to reinstate Alston based on the Union's point of order. Id.

Under the "cause of grievance" section of the Alston grievance, the Union representative wrote "unjust termination." Durham's Mot. Ex. 9. Durham argues that the grievance therefore was limited to the issue of "whether Alston's termination was for just cause." Id. at 15. Durham contends that the PGC went beyond the scope of this grievance by deciding "whether Durham actually discharged Alston," an issue that "had not been submitted to it and that was reserved exclusively to Durham." Id. at 15–16.

The Union disputes Durham's characterization of the PGC decision and argues that the decision in fact centered on whether Alston's termination was for just cause. Union's Resp. to Durham's Mot. at 1. The Union further points to certain provisions of the PGC's by-laws and the 2013 CBA, which it contends the PGC panel relied upon when making its decision. Union's Mot. 18–19. Specifically, Article VII(A) of the by-laws provides, in pertinent part:

> In the hearing of a case either party may present any evidence bearing on the facts of a particular case, and may present testimony of witnesses either in person or by sworn affidavit/notarized statement. All sworn affidavits, emails and/or documentation on official letterhead are to be furnished to the other party by 5:00 p.m. on the Friday before the hearing.

Id. Ex. 3 at 5. Article VII(I) provides, in part, that "[t]he Panel members hearing any case will be obligated to make a decision based on the pertinent facts presented by the parties." Id. Ex. 3 at 6. Article 20, Section 1 of the CBA provides that to properly discipline an employee, Durham is required to issue a written document signed by the employee and a Union steward, with a copy to the Union. Id. Ex. 2 at 17.

In light of these provisions, the Union contends that the PGC "concluded that the discharge letter was 'pertinent facts' as provided in the By-Laws . . . and that Durham's failure to introduce the discharge letter as part of its case-in-chief was a fatal procedural

11

defect." Id. at 19. During Via's deposition testimony, he described a discussion that took place during the PGC panel's executive session that supports this rationale:

> A. We discussed the by-laws, that if -- if the union brought a case there that did not have a grievance in it, that the union would get the same ruling, because the grievance itself is the moving part of the grievance process. Just like the termination letter would have been the moving part of the company's process. . . .
>
> The discussion was, you know, whether the termination letter should be part of the termination. That was it proper that . . . they . . . didn't put a termination letter since they were the moving parties. . . .

Via Dep. 11:3-7, 12:18-24. The Union asserts that when Via refers to "the moving part," he is referring to the pertinent facts requirement in the by-laws. Union's Mot. 19. Via also stated that he believed that article 7 of the by-laws "state specifically you should bring whatever evidence, whatever facts, whatever testimony you have to support the case, and present it to the panel." Via Dep. 16:16-19.

In addition, when Houvouras was asked "[w]here in the rules does it say that [the employer] ha[s] to present the discharge letter in the brief?," he replied, "[i]t doesn't. . . . But it says that you have an -- the panel has an obligation to base its decision on the facts presented." Houvouras Dep. 29:1-3, 10-12. Houvouras indicated that the PGC panel also relied on prior PGC decisions to resolve the Union's point of order. Specifically, Houvouras stated, "I did struggle with that decision, but since there was [sic] other decisions prior to that, I felt that we had to stay in line with that previous decision on the point of order." Id. 10:23–11:1.

Here, Houvouras is referring to two previous decisions that the PGC issued on similar points of order. The first decision resulted from a hearing held on April 28, 2010 that involved the Union and First Student ("the First Student decision"). Union's Mot.

12

Ex. 5 at 3.  At the hearing, the PGC upheld the Union's point of order that the First Student representative did not submit the employee in question's discharge letter as part of its case in chief.  Id. Ex. 5 at 14–18.  The employee was reinstated as a result.  Id. at 5.  The second decision resulted from a hearing held on September 28, 2011 that involved Teamsters Local 175 and Coca-Cola ("the Coca-Cola decision").  Id. Ex. 6 at 3.  At this hearing, the PGC similarly upheld Teamsters Local 175's point of order that the Coca-Cola representative did not submit a discharge letter during her case in chief.  Id. Ex. 6 at 13–19.  Following the decision, Coca-Cola reinstated the employee in question.  Id. at 6.

Although the PGC decisions are only published to the parties involved in the case, it does not appear that they were intended to be kept secret.  Durham's Resp. to Union's Mot. 10; Hr'g Tr. 10–11.  Indeed, Houvoras told a Coca-Cola representative that the PGC panel "was a participatory panel" and indicated that it would be beneficial for participants to attend the hearings to better understand the PGC's interpretation of its by-laws and the CBA.  King Dep. 20:7-10.  Accordingly, after consideration of this court's limited scope of review as noted in section II.B above, although the PGC panel construes "precedent" in a somewhat different way than this court, the evidence does not indicate that such an interpretation was outside the PGC panel's scope of authority.

Admittedly, Houvouras and Via offer differing opinions on whether the PGC panel based its decision on the merits of the Alston grievance.  Specifically, Houvouras testified that the Union's point of order raised the issue that Alston was never discharged, rather than the issue that her termination was unjust.

> Q.  Okay.  Was there any doubt in your mind that Ms. Alston had been discharged?
> A.  Yes.

> Q.  There was?  So there was doubt in your mind that she had been discharged based on what?
> A.  Based on the point of order.

Houvouras Dep 25:23–26:3.  Via's testimony, however, indicated that the PGC panel did not doubt the termination of Alston and made a decision based on the merits of the grievance.

> A.  At the point where the point of order came we had the complete merits that the company had to substantiate that they -- their case would support the termination of that person.
> Q.  But you didn't doubt that -- you knew that she had been terminated, right?  You weren't saying she had not been terminated, right?
> A.  I don't think anybody said she wasn't terminated.

Via Dep. 17:14-22.

To understand the reasoning and scope of the PGC panel's decision, the court looks to the entirety of the testimony from Houvouras and Via.  After careful review, the court finds that Houvouras and Via have provided a basis in the by-laws and the CBA for the PGC panel's decision to uphold the Union's point of order and reinstate Alston.  Accordingly, because "the arbitrator is [] arguably construing or applying the contract and acting within the scope of his authority," the court finds that that the PGC decision draws its essence from the CBA and PGC by-laws.  <u>Yuasa, Inc.</u>, 224 F.3d at 321.  Therefore, the court will not vacate the PGC's decision to reinstate Alston.

### C.     PGC's Motion for Summary Judgment

Having decided not to vacate the PGC's decision to reinstate Alston, the court must now address Durham's allegations that the PGC breached the PGC's own by-laws in reaching its decision.  Third-Party Compl. ¶ 3.  In its motion for summary judgment, the PGC argues that it is immune from Durham's suit because the breach of contract claim arises out of the PGC panel's performance of its arbitral duties.  PGC's Mot. 9.

Durham responds that the PGC "is not immune from civil liability when it violates its contract with its own members, even if the violations occur in the course of some type of adjudicatory process." Durahm's Resp. to PGC's Mot. 15–16.

> If one is appointed by agreement of parties to act as arbitrator and is empowered to resolve disputes between them, he is, in so acting, performing a 'quasi-judicial' function and is clothed with an immunity, analogous to judicial immunity, against actions brought by either of the parties arising out of the performance of his duties.

Corbin v. Washington Fire & Marine Ins. Co., 278 F. Supp. 393, 399 (D.S.C. 1968) aff'd, 398 F.2d 543 (4th Cir. 1968) (quoting Cahn v. Int'l Ladies' Garment Union, 203 F. Supp. 191, 194 (E.D. Pa. 1962)). This immunity extends to "associations, boards and other organizations sponsoring and administering arbitrations." Austern v. Chicago Bd. Options Exch., Inc., 716 F. Supp. 121, 123 (S.D.N.Y. 1989), aff'd, 898 F.2d 882 (2d Cir. 1990).

In Olson v. Nat'l Ass'n of Sec. Dealers, the plaintiff alleged that the National Association of Securities Dealers ("NASD"), of which plaintiff was a member, had breached its contract with plaintiff by improperly appointing the arbitrator who heard plaintiff's case. 85 F.3d 381, 382 (8th Cir. 1996). The plaintiff asserted that arbitral immunity did not apply to NASD because its appointment of the arbitrator "violated the NASD's own rules." Id. at 383. The Eight Circuit rejected the plaintiff's argument, finding that "[a] sponsoring organization is immune from civil liability for improperly selecting an arbitration panel, even when the selection violates the organization's own rules." Id. (citing Austern v. Chicago Bd. Options Exch., Inc., 898 F.2d 882, 884, 886 (2d Cir. 1990); Corey v. New York Stock Exch., 691 F.2d 1205, 1208, 1211 (6th Cir. 1982); Cort v. Am. Arbitration Ass'n, 795 F. Supp. 970, 972–73 (N.D. Cal. 1992)). The

15

court noted that its finding did not "leave [the plaintiff] without redress for the NASD's appointment of a possibly biased arbitrator" because "[c]ourts can vacate tainted arbitration decisions under 9 U.S.C. § 10." Id.

Similarly, in Cort v. Am. Arbitration Ass'n, the plaintiff argued that its breach of contract claim against the American Arbitration Association ("the AAA") complained of "non-judicial acts which fall outside of the scope of the arbitral immunity." 795 F. Supp. 970, 972 (N.D. Cal. 1992). The court rejected the plaintiff's assertion, noting that "it is clear from an examination of some of the allegations contained in plaintiff's complaint that his action is an attempt to escape the arbitral immunity bar." Id. Specifically, the breach of contract claim alleged in part that the plaintiff had reached an agreement with the AAA to administer the arbitration, the AAA had agreed to follow its rules, and the AAA had promised to give effect to the terms of the agreement between the two parties to the arbitration. Id. at 972 n.3. The court found that "the acts complained of by plaintiff clearly fall into the category of acts performed during the course of resolving a dispute between the parties" and dismissed the plaintiff's claims. Id. at 973.

Here, Olson and Cort indicate that Durham's breach of contract claim against the PGC is likely an attempt "to escape the arbitral immunity bar." Cort, 795 F. Supp. at 972. Notably, Durham cites no authority for the proposition that the PGC would only be "immune from suit by disgruntled third parties who are adversely impacted by its decisions." Durham's Resp. 15. To the contrary, the case law overwhelmingly indicates that arbitral immunity applies whenever the allegations against an arbitration-sponsoring association arise out of an arbitration proceeding. Austern, 898 F.2d at 886 ("Accordingly, we hold that arbitrators in contractually agreed upon arbitration

16

proceedings are absolutely immune from liability in damages for all acts within the scope of the arbitral process."); Corey, 691 F.2d at 1209 (finding that the defendant, the board that sponsored the arbitration, "is immune from civil liability for the acts of the arbitrators arising out of contractually agreed upon arbitration proceedings").

Because Durham's allegations against the PGC arise out of an arbitration proceeding, the court finds that the PGC is immune from Durham's breach of contract claim under the doctrine of arbitral immunity.  Having granted the PGC's motion for summary judgment on this basis, the court will not address the PGC's other arguments.

## IV.  CONCLUSION

For the reasons set forth above, the court finds that the PGC panel's decision drew its essence from the CBA and the PGC by-laws.  Consequently, the court will not vacate the PGC panel's decision to reinstate Alston.  The court further finds that because Durham's allegations against the PGC arise out of an arbitration proceeding, the PGC is immune from Durham's suit.  Therefore, Durham's motion for summary judgment is **DENIED**, the Union's motion for summary judgment is **GRANTED**, and the PGC's motion for summary judgment is **GRANTED**.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 29, 2015**
**Charleston, South Carolina**